NOT FOR PUBLICATION                                    (Doc. No. 63)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

_____
                                          :
CRUM & CRUM ENTERPRISES, INC.,            :
BRENDA CRUM, GEORGE CRUM,                  :
MARY ELY and IRV ELY,                      :
                                          :
                 Plaintiffs,              :     Civil No. 09-145 (RBK)
                                          :
          v.                              :     **OPINION**
                                          :
NDC OF CALIFORNIA, L.P.,                   :
                                          :
                 Defendant.               :
_____  :

**KUGLER**, United States District Judge:

This matter arises out of the alleged breach of an employment contract. Prior to this

motion, Crum and Crum Enterprises, Inc. ("Crum & Crum"), brought a breach of contract claim

against NDC of California, L.P. ("NDC") for breach of the Asset Purchase Agreement

("Agreement") the parties entered into on July 31, 2006. NDC brought a counterclaim against

Brenda Crum for breach of a two-year consulting agreement ("Consulting Agreement") the

parties entered into in connection with the Agreement. Presently before the Court is the Motion

for Summary Judgment by Ms. Crum on NDC's counterclaim for breach of contract. Under the

terms of the Consulting Agreement, Ms. Crum was obligated to devote her "best efforts" to

performing each of her contractual obligations. Ms. Crum argues that summary judgment is

appropriate because: (1) she performed her duties as a consultant by communicating with current

customers, potential customers, and NDC employees via email, telephone, and in writing

1

throughout the duration of the two-year contract period; (2) after being asked by senior management to leave NDC's primary facility, she continued to meet her contractual obligations by traveling to meet customers and meeting every request made by NDC officers; and (3) NDC offers no documentary evidence to prove that she breached the Consulting Agreement.  NDC argues that Ms. Crum's motion should be denied because:  (1) she failed to produce any calenders, date books, emails, letters, phone bills, or expense reports to corroborate her claim that she performed her obligations under the Consulting Agreement; and (2) the testimony of B.J. Patterson, Ms. Crum's supervisor, demonstrates that Ms. Crum failed to meet her contractual obligations.  For the reasons expressed below, Ms. Crum's motion is denied.

## I.     BACKGROUND

Crum & Crum is a corporation that provides third-party value-added warehouse and distribution logistics for food products manufacturers, household products manufacturers, and grocery stores.  "Third-party logistics" involves the "provis[ion] [of] transportation, freight forwarding, warehousing, distribution, and other supply chain services to customers."  (Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J., at 3.)  Prior to 2008, Crum & Crum operated one distribution center in Kentucky and three distribution centers in California.  Prior to April 2006, Safeway and Clorox accounted for approximately eighty-five to ninety percent of Crum & Crum's revenue.

NFI Industries ("NFI") is a private company that provides integrated logistics solutions and distribution and transportation services through its affiliates.  NDC is an affiliate of NFI.

On July 21, 2006 Crum & Crum and NDC entered into the Agreement.  Pursuant to the terms of the Agreement, NDC purchased all of Crum & Crum's assets.  In connection with this

sale, Ms. Crum and NDC executed the Consulting Agreement.  Under the terms of the

Consulting Agreement, Ms. Crum was obligated to perform certain consulting services for the

two-year period beginning on July 21, 2006, and ending in July 2008.  The Consulting

Agreement provides in relevant part:

> Consultant agrees to provide such services to the Company initially
> with respect to:  (1) the maintenance as well as the coordination of
> sales and customer relations with those customers of C & C that
> have been assigned and transferred to Company or such other
> customers of Company that Company may, from time to time,
> identify; (2) the retention of the Hired Employees employed or
> utilized by the Company who were previously employed or utilized
> by C & C on the Closing Date; (3) the solicitation of new business;
> and (4) such other related matters as may be assigned from time to
> time by the Company ("Transition Services").

(Pl.'s Mot. for Summ. J. on Def.'s Counterclaims App., at 18.)  In addition to the aforementioned

terms, the Consulting Agreement provided that Defendant was to "devote her best efforts," and

"that amount of time necessary" to fulfill her contractual obligations, and that she would "make

herself available to [NDC] at such other times, upon reasonable notice, at [NDC's] request."

(Id.)  In exchange for these services, NDC promised to pay Ms. Crum $150,000.00 per year.

The Consulting Agreement provides that "[a]s a material condition of the Company

entering into and Closing the Asset Purchase Agreement and to assist the Company in

maintaining and growing the Business and to facilitate a smooth transition of the Business, the

Company desires to retain Ms. Crum to provide consulting services to the Company in

connection with the business."  (Id.)  Mr. B.J. Patterson, Ms. Crum's immediate supervisor,

remarked that "NDC wanted to retain [Ms. Crum] as a consultant," because "[Ms. Crum] was the

face of Crum & Crum and NDC believed her continued involvement in the business after it was

acquired by NDC would help maintain existing customers and employees."  (Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. App., at 3.)

During discovery, Ms. Crum offered no documentary evidence to prove that she satisfied her contractual obligations.  Instead, she offered deposition testimony to prove that she performed her duties under the contract.  For example, Ms. Crum stated that she "worked out of the West Sacramento facility and regularly communicated via telephone, electronic mail, orally, and in writing with the [sic] NDC's employee's, current customers, and potential customers." (Pl.'s Opening Br. in Supp. of Her Mot. for Summ. J. on Def.'s Counterclaims, at 5.)  Ms. Crum also stated that she worked out of the West Sacramento facility until November 2006 when David Carpenter, then-President of NDC's Warehousing Division in California, told her to stop coming to the office.  Ms. Crum claims that after November 2006 she began to perform her duties from home, and occasionally traveled to other locations such as Kentucky, Los Angeles, and San Francisco to attend meetings related to her duties under the Consulting Agreement.  Ms. Crum claims that as time progressed, NDC asked her to do less work under the contract. According to Ms. Crum, eventually NDC contacted her infrequently, with very few specific requests.  Despite this overall decline in communication, Ms. Crum maintains that she stood ready to perform her duties under the Consulting Agreement when called upon to do so.

NDC offered a sworn affidavit by Mr. Patterson to prove that Ms. Crum failed to discharge her duties under the Consulting Agreement.  First, Mr. Patterson stated that Ms. Crum failed to maintain and coordinate sales with Safeway and Clorox – two of Crum & Crum's largest customers.  According to Mr. Patterson, during meetings with Safeway, instead of building NDC's relationship with Safeway, Ms. Crum frequently told anecdotal stories about her

employment with Crum & Crum, and discussed the advantages of the former Crum & Crum method of doing business.  According to Mr. Patterson, Ms. Crum's actions were so disruptive that he and Mr. Carpenter asked her not to attend NDC meetings with Safeway.  Second, Mr. Patterson stated that Ms. Crum put forth little effort to retain former Crum & Crum employees. Instead of encouraging former Crum & Crum employees to embrace NDC policies and procedures, Ms. Crum would "ask NDC employees why they were changing procedures and processes from those that were in place under Crum & Crum," and describe to employees what she believed were the advantages of Crum & Crum operating procedures.  (Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. App., at 6.)  Third, Mr. Patterson noted that during the two-year period of the Consulting Agreement, Safeway terminated its existing warehouse agreement and discontinued its business operations with NDC in three California warehouses.  Finally, Mr. Patterson stated that Ms. Crum failed to secure <u>any</u> new customers during the entire two-year period of the contract, and failed to solicit any new business for NDC during 2008.

On March 31, 2009, Crum & Crum brought an action against NDC for breach of contract. In the Amended Complaint, Crum & Crum alleged that it complied with the terms of the Agreement, but that NDC failed to make a Contingent Payment of $2,200,000.00 as required by the Agreement.  NDC responded with a counterclaim against Ms. Crum for breach of contract for failing to perform her obligations under the Consulting Agreement.  Now, Ms. Crum moves for summary judgment on NDC's counterclaim.

## II.    LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue of material

fact exists only if the evidence is such that a reasonable jury could find for the nonmoving party.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the Court weighs the evidence

presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor."  Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving

for summary judgment.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir.

1996).  The moving party may satisfy its burden either by "produc[ing] evidence showing the

absence of a genuine issue of material fact" or by "'showing' – that is, pointing out to the district

court – that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477

U.S. at 325.

Once the moving party satisfies this initial burden, the nonmoving party must "set out

specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  To do so, the nonmoving

party must "do more than simply show that there is some metaphysical doubt as to the material

facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, to

survive summary judgment, the nonmoving party must "make a showing sufficient to establish

the existence of [every] element essential to that party's case, and on which that party will bear

the burden of proof at trial."  Celotex, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary

judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those

facts of record which would contradict the facts identified by the movant.'"  Corliss v. Varner,

247 Fed. Appx. 353, 354 (3d Cir. Sept. 17, 2007) (quoting Port Auth. of N.Y. and N.J. v.

Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

6

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility determinations are the province of the factfinder, not the district court.  BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.    DISCUSSION

Pursuant to the Consulting Agreement, Delaware law governs this dispute.[1]  Under Delaware law, it is well-settled that "[c]ontracts must be construed as a whole to give effect to the intentions of the parties."  Nw. Nat. Ins. Co. v. Esmark, Inc., 672 A.2d 41, 43 (Del. 1996). "Because Delaware adheres to the objective theory of contract interpretation, the court looks to the most objective indicia of that intent:  the words found in the written instrument."  Sassano v. CIBC World Mkts. Corp., 948 A.2d 453, 462 (Del. Ch. 2008).  When construing basic contractual terms, the "court ascribes to the words their 'common or ordinary meaning,' and interprets them as would an 'objectively reasonable third-party observer.'"  Id.  Thus, "[w]here contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning."  Nw. Nat. Ins. Co., 672 A.2d at 43.

In Delaware, "best efforts" clauses are enforceable, and a party that fails to use its best efforts is susceptible to liability for breach of contract.  Conley v. Dan-Webforming Intern. A/S (Ltd.), No. 91-401, 1992 WL 401628, at *19 (D. Del. Dec. 29, 1992) (citing Corwin et al. v. deTrey et al., C.A. No. 6808, slip op., at 5 (Del. Ch. Dec. 1, 1989)).  See Eckman Corp. v. Malchin, 297 A.2d 446, 450 (Del. Ch. 1972).  A "[b]est efforts clause . . . insures the parties will

---

[1] Pl.'s Mot. for Summ. J. on Def.'s Counterclaims App., at 23.

do their best to accomplish the conditions necessary to complete the contract."  <u>Conley</u>, 1992 WL

401628, at *19.  Although Delaware courts do not define the precise contours of the duty of best

efforts, precedent from other jurisdictions is instructive.  Generally, the duty of "best efforts" is

more exacting than the duty of good faith, and requires the promisor to undertake its contractual

obligations diligently and with reasonable effort.  <u>See</u> <u>Nat'l Data Payment Sys., Inc. v. Meridian</u>

<u>Bank</u>, 212 F.3d 849 (3d Cir. 2000) (citing 2 E. Allan Farnsworth, Farnsworth on Contracts, 383-

84 (2d ed. 1998)) (applying Pennsylvania law and finding that "the duty of best efforts 'has

diligence as its essence' and is 'more exacting than the usual duty of good faith.'").  <u>See also</u>

<u>Martin v. Monumental Life Ins. Co.</u>, 240 F.3d 223, 234 (3d Cir. 2001) ("'[B]est efforts' [is] a

form of good faith and sound business judgment."); <u>T.S.I. Holdings, Inc. v. Jenkins</u>, 924 P.2d

1239, 1250 (Kan. 1996) (defining "best efforts" as "a duty [that] requires a party to make such

efforts as are reasonable in light of that party's ability and the means at its disposal and of the

other party's justifiable expectations," and noting that "the duty of best efforts is more onerous

than that of good faith."); <u>Foster Wheeler Broome Cnty, Inc. v. Cnty of Broome</u>, 275 A.D.2d

592, 593-94 (N.Y. App. Div. 2000) (holding that obligation to use best efforts satisfied by

showing that promisor "made a genuine effort to assist [the] plaintiff in securing the required

permit"); <u>Kroboth v. Brent</u>, 625 N.Y.S.2d 748 (N.Y. App. Div. 1995) ("'Best efforts' requires

that the plaintiffs pursue all reasonable methods for obtaining subdivision approval . . . ."); E.

Allan Farnsworth, <u>On Trying to Keep One's Promises:  The Duty of Best Efforts in Contract</u>

<u>Law</u>, 46 U. Pitt. L. Rev. 1, 8 (1984) ("Best efforts is a standard that has diligence as its essence

and is imposed only on those contracting parties that have undertaken such performance.").

Furthermore, it is well-accepted that "'best efforts' depends upon the factual

8

circumstances surrounding an agreement."  Id. at 233 (citing Triple-A Baseball Club Assocs. v.

Ne. Baseball, Inc., 832 F.2d 214, 225 (1st Cir. 1987)).  Thus, a determination of best efforts is a

fact intensive inquiry that is appropriately reserved for the factfinder.  See Clubcom, LLC v.

Captive Media, Inc., No. 2:07-cv-04162, 2010 WL 3718887, at *8 (W.D. Pa. Sept. 20, 2010)

("The determination of best efforts is most appropriately made by a trier of fact."); Brown v.

Buschman Co., No. 99-108, 2002 WL 389139, at *5 (D. Del. Mar. 12, 2002) ("whether [the

defendant] used its best efforts is a fact intensive inquiry").

> A.      **The Consulting Agreement**

The parties do not dispute the terms of the Consulting Agreement.  The plain language of

the Consulting Agreement provides that Ms. Crum must successfully perform the following three

tasks in order to receive an annual salary of $150,000.00.  First, Ms. Crum must maintain and

coordinate sales and customer relations with customers of Crum & Crum that have been assigned

and transferred to NDC.  Second, Ms. Crum must retain employees who were previously

employed by Crum & Crum before the parties entered the Agreement.  Third, Ms. Crum must

solicit new business.  Finally, the Consulting Agreement provides that Ms. Crum must devote her

"best efforts" to achieve each of these objectives.  As described above, this means that Ms. Crum

must undertake her duties with diligence, in good faith, and with reasonable effort.  Therefore,

the relevant inquiry is whether there is a material issue of fact regarding whether Ms. Crum

breached the Consulting Agreement by failing to devote her "best efforts" to each of her

contractual obligations.

**B.      Whether Defendant Breached the Consulting Agreement**

Under Delaware law, the elements of a claim for breach of contract are:  (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiff.  VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003).

Both parties agree that Ms. Crum had a duty to use her best efforts to perform her contractual obligations under the Consulting Agreement.  However, the parties dispute whether she breached those obligations.  Specifically, Ms. Crum argues that she performed her contractual obligations by:  (1) "work[ing] out of the West Sacramento facility and regularly communicat[ing] via telephone, electronic mail, orally, and in writing with the [sic] NDC's employees, current customers, and potential customers," and (2) "travel[ing] to multiple locations . . . in order to attend meetings related to her actions under the Consulting Agreement." (Pl.'s Opening Br. in Supp. of Her Mot. for Summ. J. on Def.'s Counterclaims, at 5-6.)  Ms. Crum also argues that she "stood ready to perform" under the Consulting Agreement, notwithstanding the fact that Messrs. Patterson and Carpenter ordered her not to attend meetings with Safeway.  In response, NDC contends that Ms. Crum:  (1) failed to maintain and coordinate sales with either Safeway or Clorox – the two largest customers of the former Crum & Crum; (2) emphasized the advantages of the former Crum & Crum methods of doing business instead of attempting to retain former Crum & Crum employees; and (3) failed to solicit any new business for NDC in 2008.

This Court finds that summary judgment should be denied for the following reasons. First, NDC met its burden by offering evidence that Ms. Crum failed to meet her obligation to maintain and develop relationships with former Crum & Crum customers.  In his affidavit, Mr.

10

Patterson offered ample evidence that Ms. Crum failed to maintain sales with former Crum &

Crum customers, and acted disruptively during meetings with former Crum & Crum customers.[2]

For example, Mr. Patterson stated that during meetings with Safeway, Ms. Crum "continually

dwelled on anecdotal stories and the advantages of the former Crum & Crum method of

transacting business as compared to the NDC method of doing business," rather than promoting

---

[2] Ms. Crum argues at great length that this Court should not consider Mr. Patterson's affidavit because NDC failed to present Mr. Patterson as the witness "most knowledgeable of [Ms. Crum's] performance of the Consulting Agreement . . . " at the Rule 30(b)(6) deposition, or in response to Plaintiffs' Interrogatory 3. (Pl.'s Reply Br. in Supp. of Her Mot. for Summ. J. on Def.'s Counterclaims, at 2, 3.) Ms. Crum also argues that NDC failed to present Mr. Patterson's affidavit as a "communication" relating to Ms. Crum's performance in response to Ms. Crum's Interrogatories 4 thru 6. As a result, Ms. Crum argues, "NDC cannot be allowed to withhold the extent and substance of Mr. Patterson's knowledge throughout discovery, only to spring that supposed knowledge on Brenda at the last possible moment." (Id.) Ms. Crum goes on to state that this Court should not consider Mr. Patterson's testimony pursuant to Federal Rule of Civil Procedure 37.

Assuming for the purpose of argument that this Court agrees with Ms. Crum's contention that NDC could have, and perhaps, was required to, present Mr. Patterson as a corporate designee under Rule 30(b)(6), the Court may exercise its discretion to determine the appropriate sanction. See Fed. R. Civ. P. 37(b)(2) (providing that when a party fails to obey an order to provide or permit discovery, the court may impose one of seven disciplinary measures, including, but not limited to, "directing that matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims," and "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence.").

This Court is not persuaded that it should not consider Mr. Patterson's affidavit for the following reasons. First, allowing NDC to support its motion for summary judgment with Mr. Patterson's testimony does not prejudice Ms. Crum because the evidence in the record demonstrates that Ms. Crum was aware that Mr. Patterson was a witness with personal knowledge, but chose not to depose him. In the Rule 26(a) Initial Disclosures, Ms. Crum listed Mr. Patterson as a an individual likely to have discoverable information that [Ms. Crum] may use in support of [her] claims or defenses." (Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. App., at 17.) Consequently, this Court finds it difficult to believe that by taking into consideration Mr. Patterson's affidavit to decide this motion for summary judgment, it will prejudice Ms. Crum, or, as Ms. Crum argues, NDC is playing a "game" or "seeking to avoid providing information via dilatory tactics." (Pl.'s Reply Br. in Supp. of Her Mot. for Summ. J. on Def.'s Counterclaims, at 3.)

Moreover, if Ms. Crum was in fact prejudiced by NDC's failure to identify Mr. Patterson as a corporate designee, she can make a motion to reopen discovery to depose Mr. Patterson. The Court may then afford Ms. Crum the opportunity to depose Mr. Patterson and refile this motion for summary judgment, or use Mr. Patterson's deposition at trial to adjudicate the merits of NDC's counterclaim for beach of contract.

NDC's relationship with Safeway.  (Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J.

App., at 5.)  To illustrate the severity of this disruptive behavior, Mr. Patterson noted,

> [Ms. Crum's] insistence on discussing past practices of Crum &
> Crum and inability to move forward forced me to ask Ms. Crum
> not to attend the quarterly meetings with Safeway.  In those
> quarterly review meetings, NDC focused on presenting the
> performance data and the NFI method of conducting business, and
> Ms. Crum's manner of interacting with the customer was not
> conducive to building our brand with Safeway.

(Id.)

Moreover, during the two-year period of the contract, Ms. Crum provided Mr. Patterson

with no indication that she was cultivating a relationship with Safeway.  Ms. Crum offered no

documentary evidence in the form of emails, letters, memoranda, or any other documentation to

prove that she devoted her "best efforts" to maintain relationships with existing Crum & Crum

employees.  In fact, during early 2008, Safeway notified NDC that it planned to terminate its

existing warehousing agreement with NDC and that it would discontinue its business with NDC

in three California warehouses.  To refute this evidence, Ms. Crum relies solely upon her

testimony that she did in fact work to maintain relationships with existing Crum & Crum

customers and NDC.  This evidence, however, merely demonstrates that a triable issue of fact

exists concerning whether Ms. Crum adequately discharged her duties pursuant to the Consulting

Agreement.  However, as previously noted, in deciding the merits of a party's motion for

summary judgment, the court's role is not to evaluate the evidence and decide the truth of the

matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.

When conducting this inquiry, the court must consider all evidence in the record and draw all

inferences in favor of the nonmoving party.  West v. Garcia, No. 2:07-03814, 2010 WL 3952273,

at *1 (D.N.J. Oct. 08, 2010) ("[T]he Court must consider all evidence and inferences drawn

therefrom in the light most favorable to the non-moving party.") (citing <u>Andreoli v. Gates</u>, 482

F.2d 641, 647 (3d Cir. 2007)).  Therefore, because NDC offered evidence upon which a

reasonable jury can conclude that Ms. Crum failed to meet her contractual obligation to maintain

and develop relationships with former Crum & Crum customers, summary judgment is

inappropriate.

NDC also offers evidence upon which a reasonable jury can conclude that Ms. Crum

failed to retain hired employees.  NDC offered evidence that Ms. Crum did not "make any

attempt to encourage . . . employees to embrace the NFI Industries - National Distribution

Centers culture."  (Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. App., at 6.)  In

particular, Mr. Patterson stated that "Ms. Crum would continually ask NDC employees why they

were changing procedures and processes from those that were in place under Crum & Crum and

would talk with employees about what she perceived to be the advantages of the Crum & Crum

way of operating."  (<u>Id.</u> at 6.)  According to Mr. Patterson, Ms. Crum's behavior was so

disruptive that Mr. Carpenter asked her to work off-site instead of working at the NDC facility.

(<u>Id.</u>)

Ms. Crum refutes Mr. Patterson's statements by arguing that the Consulting Agreement

required NDC to continue operating the business in a manner consistent with Crum & Crum's

operating procedures, and therefore, Mr. Patterson's statement that she frequently referred to

Crum & Crum's old operating procedures is unavailing.  To construct this argument, Plaintiff

borrows language from the Contingent Payment portion of the APA, which provides that "[NDC]

. . . agrees to operate the Business consistent with the past practices of [Crum & Crum] during

the period in which the Contingent Payment is calculated and paid."  (Compl. Ex. A, Pt. 2, at 8.)

However, upon close examination of both the Agreement and the Consulting Agreement as a

whole,[3] Plaintiff's interpretation of the Contingent Payment section is, at best, unpersuasive.  E.I.

du Pont de Nemours and Co., Inc. v. Shell Oil Co., 498 A.2d 1108, 1113 (Del. 1985) ("In

upholding the intentions of the parties, a court must construe the agreement as a whole, giving

effect to all provisions therein."); id. ("[T]he meaning which arises from a particular portion of

an agreement cannot control the meaning of the entire agreement where such inference runs

counter to the agreement's overall scheme or plan.").

In particular, the Consulting Agreement – the document that specifically binds Ms. Crum

– provides that "[c]onsultant shall cooperate fully with the President, Chief Executive Officer,

and other executive officers in the Company."  (Pl.'s Mot. for Summ. J. on Def.'s Counterclaims

App., at 18.)  Mr. Patterson's testimony that Ms. Crum's conduct was so distracting that it was

necessary to remove her from all meetings with Safeway provides evidence upon which a

reasonable jury could conclude that Ms. Crum breached her contractual obligation to use her

"best efforts" to facilitate the transition between Crum & Crum and NDC.  Even if, as Ms. Crum

asserts, Mr. Patterson did not expressly order her to avoid discussing Crum & Crum's past

practices and procedures, a reasonable jury could infer that Ms. Crum's conduct, while perhaps

not overtly contumacious, was sufficiently insubordinate to warrant the presumption that she

failed to put forth her "best efforts" to perform under the terms of the Consulting Agreement.

---

[3] While the Agreement sets the terms for the purchase agreement between Crum & Crum and NDC, the Consulting Agreement governs Ms. Crum's obligations to NDC.  Specifically, the Consulting Agreement provides that "Consultant is willing to act as a consultant to the Company on the terms set forth in this Agreement."  (Pl.'s Mot. for Summ. J. on Def.'s Counterclaims App., at 18.)

14

Therefore, taking all evidence in the light most favorable to the nonmoving party, NDC offered evidence upon which a reasonable jury could conclude that Ms. Crum failed to use her "best efforts" to retain Crum & Crum employees.

Third, NDC offered evidence from which a reasonable jury could conclude that Ms. Crum failed to uphold her contractual obligation to "solicit new business" throughout 2008.  The Consulting Agreement requires Ms. Crum to "devote her best efforts" to soliciting new business for NDC throughout the entire two-year period of the contract.  However, Ms. Crum's own deposition testimony belies her claim that she met this obligation.  When counsel for NDC posed the following question to her during a deposition:  "You don't recall any efforts during 2008 to develop new business other than your conversations with the customers that have received the letter," Ms. Crum replied, "I don't recall doing any other bids or proposals."  (Pl.'s Mot. for Summ. J. on Def.'s Counterclaims App., at 18.)  Ms. Crum testified that the only customer contact she had during 2008 was with members of the Farmer's Rice Co-op.  However, instead of soliciting new business with the Farmer's Rice Co-op, Ms. Crum stated that she contacted them to "try[] to explain . . . the change in the business" resulting from the Agreement.  (Id. at 128.)  Moreover, there is no evidence that Ms. Crum actually secured any business during the two-year period of the contract.  While a determination of whether a party devoted its "best efforts" to satisfy a contractual obligation does not depend solely upon whether the party is successful, the record reveals that, at minimum, there is a triable issue of fact concerning whether Ms. Crum's inability to secure any new business was the result of her failure to devote her best efforts to her duties under the Consulting Agreement.  Therefore, because NDC offered evidence

15

from which a reasonable jury could conclude that Ms. Crum failed to solicit new business for NDC during 2008, summary judgment is inappropriate.

Finally, Ms. Crum seeks to convince this Court that "[Mr.] Patterson's averred decision to stop communicating with [her] is . . . fatal to NDC's counterclaim for breach because under the Consulting Agreement, [she] was entitled to notice and a 10-day opportunity to cure certain defects in her performance." (Pl.'s Reply Br. in Supp. of Her Mot. for Summ. J. on Def.'s Counterclaims, at 6.) The Consulting Agreement provides that Ms. Crum's services may be terminated "upon a determination by [NDC] that there is Cause (as defined below) for such termination . . . ." (Pl.'s Mot. for Summ. J. on Def.'s Counterclaims App., at 20.) The Consulting Agreement defines "cause" as "a material failure of Consultant to perform or observe any of the terms or provisions of [the] Agreement after notice and a ten (10) day opportunity to cure . . . ." (Id.) Therefore, based upon the plain language of the Consulting Agreement, NDC could only terminate Ms. Crum's employment for "cause" after providing her with notification ten days prior to termination and an opportunity to remedy the deficiency.

Ms. Crum's argument that NDC is precluded from bringing its counterclaim fails because this is not an action for wrongful termination based on NDC's failure to perform a condition precedent – it is a claim for breach of contract. The record is devoid of any evidence that NDC attempted to terminate Ms. Crum's employment. In fact, Mr. Patterson stated that after he asked her not to attend quarterly review meetings with Safeway, "no one at National Distribution Centers ever asked Ms. Crum not to maintain and grow other customer relationships or attend meeting[s] with other existing or prospective customers." (Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. App., at 5.) Moreover, the fact that NDC paid Ms. Crum $300,000.00 – the

16

full amount owed to her under the Consulting Agreement – for two-years of labor under the terms of the contract demonstrates that it did not intend to terminate Ms. Crum's employment. (<u>Id.</u> at 11.)  Accordingly, Ms. Crum's argument that NDC cannot bring a breach of contract claim fails under the express terms of the Consulting Agreement.

Therefore, taking all evidence in the light most favorable to NDC, Ms. Crum failed to offer sufficient evidence upon which a reasonable jury could find that she did not breach the Consulting Agreement.  Taken in whole, Mr. Patterson's affidavit and Ms. Crum's performance during 2008 reveal that a material issue of fact exists concerning whether Ms. Crum devoted her "best efforts" to performing her contractual obligations under the Consulting Agreement.

## IV.   CONCLUSION

For the foregoing reasons, the Court will deny Ms. Crum's motion for summary judgment with respect to NDC's breach of contract counterclaim.  An accompanying order shall issue today.

Dated:   11/1/2010                                          /s/ Robert B. Kugler
                                                              ROBERT B. KUGLER
                                                              United States District Judge